**In the United States District Court**
**For the District of Kansas**

---

**United States of America**,
           Plaintiff,

v.                                                                Case No. 22-10054-01 JWB

**Tremayne M. Darkis**,
           Defendant.

---

### Motion to Suppress Statements

"When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights, and the statements are inadmissible at trial as evidence of guilt." *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). As we explain below, that's precisely what happened here. Under police questioning, Mr. Darkis made incriminating statements. But the police induced those incriminating statements by promising Mr. Darkis that the government would not, and could not, use those statements against him. In doing so, police violated Mr. Darkis's Fifth Amendment rights. Mr. Darkis therefore respectfully moves the Court to grant him an evidentiary hearing and, ultimately, to suppress these statements pursuant to 18 U.S.C § 3501(a).

    First the Court will have to determine if and when Mr. Darkis was in custody and subject to interrogation as those terms are used in the context of *Miranda*. Then regardless of the *Miranda* analysis, the Court must determine if Mr. Darkis's

statements were involuntary. Finally, the Court will determine if due process requires upholding the officer's promise of non-use of the statements.

## I.   Anticipated Facts

In October 2020, while in custody at the Joplin County jail, Mr. Darkis initiated contact with the Federal Bureau of Investigation. On October 20, 2020, officers from the top federal and state investigative bureaus paid him a visit. One agent from the FBI and one from the KBI met with Mr. Darkis in a small, narrow room in the county jail. Mr. Darkis sat—in his jail-issued orange jumpsuit—in front of a long table with the two agents positioned between him and the closed door.

Mr. Darkis tried to set boundaries for the scope of his conversation with the investigators. Despite his attempt to lay boundaries, law enforcement controlled the conversation. After asking about his pending cases, (including the charges from June 20, 2020, the subject of this pending federal case), the officers said they had other questions for Mr. Darkis and began to ask about criminal activity in the community.

This contact between two different law enforcement agencies, one state and one federal, can best be examined by breaking it into four parts.

- Segment One: Beginning of the interrogation until about 16 minutes in.
- Segment Two: The 16th minute until the 24th minute.
- Segment Three: The 24th minute to the 26th minute.
- Segment Four: The remainder of the interview.

In Segment One, the officers introduce themselves. Mr. Darkis then tries to ascertain the boundaries of the conversation. He also asks what the officers will do for him if he agrees to provide information to the officers. This segment is not a custodial interrogation, and we do not ask the Court to suppress this portion of the interview.

Segment Two is a different story and the Court should find Mr. Darkis was subject to custodian interrogation from the this point forward. At approximately the 16-minute mark, the tone of the interview shifts. Rather than posing inquisitive questions, the officers begin asking accusatory ones. Sensing this shift, Mr. Darkis asks (at approximately the 24-minute mark) if the statements he makes during this conversation can be used against him. Specifically, he says, "Let me ask you a question—anything I say y'all going to give me a case for? Can I get a case for any of this?"

In response, law enforcement says, "I don't know," and then closely follows up with "[W]ell, I'd have to read you your rights to hang it on you." The next part of the conversation is difficult to make out, but it sounds like law enforcement finishes that sentence with "but I don't wanna do that," and a short laugh. He then says, "Well, if you want me to do that, I'll do that," while the other officer adds, also laughing, "but I don't have the waiver forms out right now." The officer then gestures to his folder and tells Mr. Darkis he does have the forms. Mr. Darkis says, "I just wanted to make sure." At this time, neither the federal agent nor the state officer advised Mr. Darkis of his right to know that his statements could, in fact, be

used against him. Officers went on to elicit incriminating statements from an unwarned, outnumbered, and handcuffed Tremayne Darkis which is why any statements after the 16-minute mark should be suppressed.

## II.     Statement of Law

The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."[1] Because the privilege against self-incrimination is the "hallmark of our democracy,"[2] and "the essential mainstay of our adversary system,"[3] we have developed safeguards to protect the right. Nowhere are these safeguards more important than where a suspect is custodially interrogated. As the Supreme Court noted in *Miranda v. Arizona*, 384 U.S. 436 (1966), "in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work ... to compel him to speak where he would not otherwise do so freely."[4] The inherent pressure is so powerful that it can coerce confessions and incriminating contradictions.[5]

To mitigate this significant risk, law enforcement is required to advise a suspect of his rights prior to initiating custodial interrogation. The suspect must be advised that "he has the right to remain silent, that anything he says can be used against

---

[1] U.S. Const. amend. V.

[2] *United States v. Grunewald*, 233 F.2d 556, 581-582 (2d. Cir. 1956) (Frank, J., dissenting), *rev'd*, 353 U.S. 391 (1957).

[3] *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U. S. 52, 55-57, n. 5 (1964).

[4] 384 U.S. at 467 (1966).

[5] *Id.* at 448.

him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." When law enforcement fails to provide these warnings before a custodial interrogation, statements elicited from the suspect are presumed to be the product of coercion and are generally inadmissible.[6]

Therefore, to introduce at trial a defendant's statement that was made during custodial interrogation, the government must show not only that *Miranda* warnings were given, but also that "the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda,* 384 U.S. at 475. Once a defendant has shown that the Fifth Amendment is implicated,[7] it becomes the prosecution's burden to prove the reasonableness of any search, *id.*, and the voluntariness of any statements.[8]

A suspect is in custody when "a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest."[9] When police question an already incarcerated person, "the determination of custody should focus on all of the features of the interrogation,"[10] including the language

---

[6] *United States v. Patane*, 542 U.S. 630, 639, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality opinion).

[7] See *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020).

[8] See *United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020).

[9] *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008).

[10] *Howes v. Fields*, 565 U.S. 499, 514 (2012).

used to summon the suspect to the interview and the way officers conduct their questioning.[11]

An inmate who is removed from the general prison population for questioning and is "thereafter ... subjected to treatment" in connection with the interrogation "that renders him 'in custody' for practical purposes ... will be entitled to the full panoply of protections prescribed by *Miranda*."[12] In *United States v. Cash*, 733 F.3d 1264, 1278 (10th Cir. 2013), the Tenth Circuit made it clear that an encounter that does not begin as a custodial interrogation for *Miranda* purposes can be converted into a custodial interrogation. In *Cash,* the Court examined both parts of the encounter to decide whether, even though the first exchange was not an interrogation, the second exchange "elevate[d] the brief encounter into an interrogation." In *Howes v. Fields*,[13] the Supreme Court reiterated that there is no bright line rule for determining whether a subject already in jail is also in custody for purposes of applying *Miranda.* In *Howes*, the subject was not questioned about the matter he was in jail for, he was advised he was free to leave at least twice, and he was not physically restrained.

In Mr. Darkis's case, the first officer performs a pronounced pivot to accusatory questioning when he starts asking questions that go beyond whether or not anyone wants to make a deal to provide information in exchange for something. Mr. Darkis

---

[11] See *Yarborough v. Alvarado,* 541 U.S. 652, 665, 124 S.Ct. 2140 (2004).

[12] *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138 (1984).

[13] *Howes v. Fields*, 565 U.S. 499 (2012).

was in custody pre-trial, was questioned about the cases he was in custody for and that had already been investigated and charged, was handcuffed, and was not advised he was free to leave. At the 16-minute mark of Mr. Darkis's interaction with law enforcement the meeting is converted into a custodial interrogation, and he should have been read *Miranda* warnings.

"To be admiss[i]ble, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort."[14] Voluntariness is determined under the totality of the circumstances, and no single factor is determinative.[15] Even more egregious in Mr. Darkis's case, law enforcement act like they are intentionally not reading Mr. Darkis his rights in order to protect him.[16] Law enforcement induced him to continue talking to them through this false promise that so long as they don't read him his rights his statements can't be used against him. As in *Young*, when the agent misleads the defendant, the officers here both leapt at the opportunity to reassure Mr. Darkis that so long as they didn't read him his rights, he statements couldn't be used against him. Even if the officers suggest they were only saying what they thought the law was, it's the subjective viewpoint of the defendant that

---

[14] *Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir. 1993).

[15] See *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006).

[16] See *United States v. Young*, 964 F.3d 938, 942-46 (10th Cir. 2020) (and cases cited therein).

matters: "we view the coercive nature of assertions from the standpoint of the defendant."[17]

Mr. Darkis attempted to establish boundaries and was offered a non-use agreement by law enforcement. Due process requires the Court to enforce the non-use agreement that the officers made with Mr. Darkis when they told him so long as they didn't read him *Miranda* he could speak freely with them without fear of reprisal.

> "Yet we see no reason to treat a non-arrest agreement any differently than the non-prosecution and plea agreements we have previously held enforceable against the government. In non-arrest agreements, as in non-prosecution and plea agreements, the government wields its vested authority to extract cooperation from a potential defendant in exchange for a promise of leniency. A police officer is not entitled to arbitrarily breach these agreements, which have become a central feature of the many drug-related prosecutions that occupy our criminal legal system each year. See Alexandra Natapoff, Snitching: The Institutional and Communal Consequences, 73 U. Cin. L. Rev. 645 (2004). In all such contexts, therefore, where an individual fulfills his obligations under the agreement, "settled notions of fundamental fairness" may require the government "to uphold its end of the bargain," too. Carrillo, 709 F.2d at 37. To hold otherwise would rubberstamp a police practice that stands to undermine "the honor of the government" and "public confidence in the fair administration of justice." *Carter*, 454 F.3d at 428.

*United States v. Bailey*, 2023 WL 4552589, (4th Cir. July 17, 2023).

Mr. Darkis attempted to set boundaries and clarify his rights with law enforcement officers before his will was overborne and he implicated himself in non-mirandized statements. All of his statements from the 16 minutes mark forward

---

[17] See *United States v. Walton*, 10 F.3d 1024, 1029 (3d Cir. 1993); *United States v. Shears*, 762 F.2d 397, 402 (4th Cir. 1985) (evaluating "the defendant's perception of what government agents have promised").

should be suppressed in violation of *Miranda*, because they were involuntary, and because due process requires it.

Respectfully submitted,

s/Jennifer Amyx
JENNIFER AMYX
Sup. Ct. No. 24260
Assistant Federal Public Defender
Federal Public Defender Office
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: 316-269-6445
Fax: 316-269-6175
Email: Jennifer_Amyx@fd.org

## Certificate of Service

I hereby certify that I electronically filed the foregoing with the Clerk of the Court on July 24, 2023, by using the CM/ECF system, which will send a notice of electronic filing to the following:

Oladotun Odeyemi
Assistant United States Attorney
Ola.Odeyemi@usdoj.gov

s/Jennifer Amyx
JENNIFER AMYX, #24260
