IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Case No. 22-10054-JWB

TREMAYNE M. DARKIS,

        Defendant.

**MEMORANDUM AND ORDER**

This matter comes before the court on Defendant Tremayne M. Darkis's motion to suppress. (Doc. 22.) The motion is fully briefed and ripe for decision. (Docs. 22, 32, 33.) The court held an evidentiary hearing on the motion on September 19, 2023. The motion is GRANTED IN PART and DENIED IN PART for the reasons stated herein.

**I.  Facts**

Defendant's motion to suppress addresses a meeting between himself and Kansas Bureau of Investigation ("KBI") Agent Darin Barnett and United States Drug Enforcement Administration ("DEA") Agent Jonathan Marr in October 2020 ("the meeting"). (Doc. 32 at 5.) Both agents were present at the hearing and testified. Defendant was present at the hearing but declined to testify. The government introduced into evidence a recording of the meeting ("the recording") (Ex. 1) and a transcript of the meeting (Ex. 2).

At the hearing, it was revealed that at the time of the October 2020 meeting, Defendant had been incarcerated in the Jasper County Jail in Missouri for approximately two and a half months on pending state charges. While he was detained on these state charges, Defendant had been attempting to meet and speak with government agents in an effort to obtain leniency in a pending

1

Kansas prosecution (the "Parsons, Kansas, case") in exchange for his cooperation. (Ex. 2 at 8:11–12.) More specifically, Defendant had been arrested in Parsons, Kansas, on June 20, 2020, on charges stemming from a car chase in which Defendant allegedly threw a firearm and a package of methamphetamine from his vehicle. He was released on bond in that case and was subsequently arrested in Missouri on different charges for which he was held at the Jasper County Jail at the time of the meeting with Agents Barnett and Marr. Agent Barnett testified that he had never met Defendant prior to the meeting, and that he visited Defendant because he believed Defendant may have information about a homicide case. Agent Marr testified that he attended the meeting because he was investigating Defendant's connection with an individual Marr suspected was dealing drugs. Both agents testified that neither attended the meeting to discuss Defendant's Parsons, Kansas, case. Some of Defendant's current federal charges arise from the Parsons, Kansas, case.

Defendant initiated the meeting to reveal information to either state or federal authorities with the hope that by doing so he would obtain a more favorable outcome in his Kansas state case and possibly avoid a federal prosecution. *Id.* at 16:22–17:1–2, 39:1–2, 42:8. The recording shows Defendant disclosed a list of individuals he knew or believed were dealing drugs. Both Agent Barnett and Agent Marr indicated they could not make promises on behalf of state or federal prosecutors. *Id.* at 4:8–6:6. According to Agent Barnett's testimony, what transpired was a "debrief" meeting, where agents attempt to discover an interviewee's involvement and knowledge about other crimes.

The meeting lasted just over an hour, and Defendant seeks to suppress all statements that he made after the 16-minute mark of the recorded interview. (Doc. 22 at 4.) Defendant concedes he was not under custodial interrogation before that point in the interview, so there is no dispute about the admissibility of statements made prior to the 16-minute mark. *Id.* at 3.

After 16 minutes, but before the 21-minute mark, there are two brief exchanges where the agents asked Defendant for inculpatory information. During the first exchange, Agent Marr asked if Defendant supplied a dealer in Parsons, Kansas with methamphetamine. (Ex. 2 at 19:3–20:2.) Defendant's response to this question is inaudible. *Id.* at 20:3. Agent Marr then told Defendant that he had gotten caught with 10 ounces of methamphetamine. *Id.* at 4. Defendant responded with: "Is that what it was?" *Id.* at 20:5. Agent Marr affirmatively answered Defendant's question with "Give or take, yeah", *id.* at 20:6, and Defendant stated he no longer wanted to talk about the Parsons, Kansas, case, *id.* at 20:4–7. During the second exchange, Agent Barnett asked Defendant how many of the individuals Defendant had identified so far were receiving methamphetamine from him. *Id.* at 23:15–16. Defendant responded: "A lot of 'em." *Id.* at 23:17. Agent Barnett asked the follow-up question: "A lot of 'em are?", *id.* at 23:18; to which Defendant answered with more detail, providing names, *id.* at 23:19–21. Shortly thereafter, Agent Barnett made a statement that implied the individuals identified by Defendant would seek him out if they needed more methamphetamine: "If they needed something. They'd come --", *id.* at 24:1, but before he could finish his statement, Defendant interjected with: "Yeah, but they might not get it from me per se . . . ." *Id.* at 24:2–3.

The following key exchange between Defendant and the Agents occurred at approximately 21 minutes into the conversation. Defendant asked: "Anything I say y'all gonna give me a case for it? Can I get a case for any of this?" *Id.* at 24:6–7. Agent Marr responded: "I don't know." *Id.* at 24:8. Agent Barnett responded: "I'd have to read your rights to hang it on you." *Id.* at 24:9. Agent Marr then agreed with Barnett's statement by saying: "Ah, yeah." *Id.* at 24:10. Defendant pressed the issue further saying, "I'm just asking y'all." *Id.* at 24:11. Agent Barnett responded: "I mean, if you want me to do that, I can do that." *Id.* 24:2–21. During this brief exchange about

3

reading Defendant his *Miranda* rights, both Agents were laughing and generally keeping the tone of the discussion light-hearted and cordial. (Ex. 1 at 21:30–22:00.)

Indeed, the recording indicates the entire meeting was jovial and friendly—which Agents Barnett and Marr corroborated at the hearing. Neither Agent Barnett nor Agent Marr threatened Defendant. There was no yelling or show of force directed at Defendant. As shown by the recording and testified to by Agent Barnett, all three spoke to one another in a conversational tone. However, the video recording shows Defendant handcuffed for the entirety of the meeting. Agent Barnett testified that he could have requested Defendant be uncuffed, but he chose not to make that request. The recording also shows the agents sitting between Defendant and the door, which remained closed. At the hearing, Defendant clarified that the agents were not carrying guns but that they continued to wear their holsters. Based on the recording, the room seemed well lit and a decent size, fitting a rectangular table shorter than 12-feet—which Agent Barnett corroborated. He also testified that during the meeting, Defendant did not seem to be under the influence of drugs or alcohol, that he tracked the conversation, and he appeared to be a person with average to above average intelligence. Neither party disputes the fact that Agents Barnett and Marr did not read Defendant his *Miranda* rights before or during the meeting. Testimony from the hearing also revealed Defendant was not informed he could terminate the conversation and leave at any time.

## II.   Analysis

Defendant admits that the meeting between himself and Agents Barnett and Marr began as a voluntary meeting. (Doc. 22 at 3.) However, Defendant asserts that this voluntary meeting transformed into a custodial interrogation at the sixteenth minute. *Id.* Defendant argues that under *Miranda*, Defendant's statements beginning at the sixteenth minute must be suppressed because neither Agent Barnett nor Agent Marr informed Defendant of his *Miranda* rights. *See id.* at 5.

4

Alternatively, Defendant argues that due process requires suppression of Defendant's inculpatory statements because they were made involuntarily. *See id.* The court will address each argument in turn.

**A. Miranda Custody**

With respect to the statements made between minutes sixteen and twenty-one, the court concludes that Defendant was not in custody under *Miranda*; thus, a *Miranda* warning was not required. Because the court finds Defendant was not in custody, it does not reach the question whether he was subject to interrogation.

In *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), the Supreme Court found that without proper safeguards, custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." However, as a threshold matter, *Miranda* warnings are required only when a defendant is in custody and subject to interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). The Supreme Court has determined that a person is in custody for *Miranda* purposes when he is formally arrested or his freedom of action is curtailed to a degree associated with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). In cases where a person is incarcerated, the Supreme Court determines *Miranda* custody by analyzing "all features of the interrogation." *Howes v. Fields*, 565 U.S. 499, 514 (2012). An incarcerated individual will not be considered in custody, for purposes of *Miranda*, if the "interrogation environment" would allow a reasonable person to feel he could terminate the interview and leave. *See id.* at 515.

First, the court must determine if Defendant was "incarcerated" for *Miranda* purposes. Defendant argues the court should *not* analyze custody under the framework established for incarcerated prisoners because Defendant was not a convicted prisoner at the time of the meeting.

5

(Doc. 33 at 4.) Defendant relies on the Supreme Court's language in *Maryland v. Shatzer*, 559 U.S. 98 (2010), where the Court distinguished three cases about recent arrestee interrogations from interrogations of convicted prisoners. *See id.* at 103–07. According to the Court, unlike sentenced prisoners, pre-trial detainees face uncertainties about the final charges, convictions, and their possible sentences. *See id.* at 114. At first glance, these factors appear apropos to Defendant's case because at the time of the meeting, he was neither convicted nor sentenced to a term of imprisonment and faced uncertainties about his final charges. But Defendant focuses on this statement from *Shatzer* without contextualizing it within the Court's broader discussion about the differences between pre-trial detainees and sentenced prisoners. In the three cases discussed by the Court, the time between the arrest and subsequent questioning ranged from one to three days, *see id.* at 107, and most importantly, the Court determined that law enforcement held the suspects in uninterrupted custody so they did not "regain[] a sense of control or normalcy after they were initially taken into custody for the crime under investigation." *Id.* at 106.

Here, Defendant had been incarcerated as a pre-trial detainee for two and half months. Unlike the suspects in the cases discussed by the Court in *Shatzer*, Defendant was not isolated at the police station with his interrogators for those two and half months, and he was not a recent arrestee at the October 2020 meeting. As the Court explained in *Shatzer*, both non-incarcerated and incarcerated individuals can experience breaks in *Miranda* custody when they are released back into their normal life and routines—which for incarcerated individuals happens to be in prison or jail and amongst fellow inmates and guards. *See id.* at 113–14. The Supreme Court noted in *Howes* that incarceration is not pleasant, but jailed individuals are familiar with restrictions on their freedom. *See Howes*, 565 U.S. at 511. The court agrees with the government that because of the length of time between Defendant's arrest and the October 2020 meeting, he likely became

familiar with the restrictions on his freedom. Moreover, because Defendant did not experience uninterrupted custody, he regained a sense of control and normalcy in his life such that his situation is different from the suspects in the cases discussed in *Shatzer*.

Defendant also initiated the meeting with Agents Barnett and Marr. (Ex. 2 at 16:22–17:1–2, 39:1–2, 42:8.) Defendant was not an arrestee forcefully whisked into a police station for questioning, and thus, at the October 2020 meeting did *not* experience the same shock and sharp change of circumstances a recent arrestee endures. *See Howes*, 565 U.S. at 511.

Therefore, because Defendant (1) had been detained for two and a half months prior to the meeting, (2) was familiar with his present status as a pre-trial detainee, (3) experienced a break in *Miranda* custody because he had acclimated to incarceration, and (4) voluntarily initiated the meeting with Marr and Barnett, his custodial status under *Miranda* is determined by considering "all features of the interrogation" to determine if a reasonable person would feel free to terminate the meeting and leave. *Howes*, 565 U.S. at 514–15.

In *Howes*, sheriff's deputies interviewed the defendant for five to seven hours well into the night. *See id.* at 514–15. The deputies were armed and at least one used a very sharp tone during the interview. *See id.* at 515. The Court indicated that these were coercive factors, but that they were offset by the following non-coercive factors: the defendant was told he could terminate the conversation and leave at any time; the defendant was not physically restrained; the deputies interviewed him in a well-lit and average size room; and he was "not uncomfortable." *See id.* The Court took special note of the uncontroverted fact that the officers told defendant he could terminate the conversation and leave at any time. *See id.* After considering these facts, the Court held the defendant was not in custody. *See id.* at 517.

Following the Supreme Court's approach in *Howes*, the court finds a reasonable person in Defendant's situation would have known that he could terminate the October 2020 meeting. Unlike the coercive factors present in *Howes*, here the recording indicates the meeting lasted for a little over an hour and did not go into the night. At the hearing, it was established that neither Agent Barnett nor Marr were armed, nor did they render a show of force against Defendant. Additionally, the recording shows that the agents did not speak to Defendant with a sharp tone; rather, all parties were friendly toward one another and used a conversational tone for the entirety of the meeting. The recording also shows that the room was well lit, and Defendant had ample space between himself and the agents. Agent Barnett testified that Defendant did not appear to be under the influence of drugs or alcohol and kept pace with the conversation, which the recording corroborates. In sum, based on testimony from the hearing and the recording, Defendant did not appear uncomfortable.

Nevertheless, unlike *Howes*, evidence from the hearing revealed Defendant was not told he could terminate the conversation and leave whenever he wanted. The recording also shows Defendant was restrained and the door to the room was closed for the meeting. However, Agent Barnett testified that neither he nor Agent Marr restrained Defendant, and they closed the door for privacy to ensure no one overheard the information Defendant was providing to government agents. Additionally, despite the agents not telling Defendant he could terminate the meeting and leave at any time, Defendant was comfortable telling the Agents he did not wish to talk about his Parsons, Kansas, case, and they responded by not asking any further questions about it.

Taking all these facts into account, the court determines a reasonable person in Defendant's position would have felt free to terminate the conversation and leave. Although there were a few coercive factors present, (i.e., Defendant was restrained, the door to the room closed, and

Defendant was not informed that he could terminate and leave the meeting), the non-coercive factors outweigh the coercive factors. Among the most compelling of those factors is the fact that Defendant instigated the meeting with an eye toward cooperating with the government in exchange for favorable treatment, and that Defendant was quite clearly leading the meeting most of the time. Moreover, the agents kept the tone of the meeting light and largely allowed Defendant to guide the conversation and, in any event, did nothing remotely coercive or threatening. Based on the foregoing, the court concludes that that Defendant was not in custody for *Miranda* purposes at any point during the meeting.

### B. Involuntariness under Due Process

Even if a defendant is not subject to custodial interrogation, his confession is involuntary and offends due process when "his will has been overborne and his capacity for self-determination critically impaired . . . ." *United States v. Pettigrew*, 468 F.3d 626, 637 (10th Cir. 2006) (citing *United States v. Lopez*, 437 F.3d 1059, 1063 (2006)). The Supreme Court has determined that when a defendant challenges a confession as involuntary, the burden rests on the prosecution to prove "by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Under Tenth Circuit precedent, "[t]he determination of voluntariness is based on the totality of circumstances." *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). More specific to this case, when a law enforcement agent assures a defendant that he will not use a defendant's statements against him, a court must determine under the totality of the circumstances whether the prosecution has demonstrated that the law enforcement agent's statements "were [not] so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." *United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993).

The government correctly notes that the issue here is not one regarding an agreement to provide leniency to Defendant in exchange for his cooperation. (Doc. 32 at 18–19.) The agents clearly informed Defendant that they had no authority to offer him leniency. (Ex. 2 at 4:8–6:6.) Instead, the issue is whether the agents led Defendant to believe that they would not, or could not, use his inculpatory statements against him. Defendant analogizes the agents' statements that they could not use Defendant's inculpatory statements against him to non-arrest agreements and non-prosecution and plea agreements. (Doc. 22 at 8.) Conforming with those labels, Defendant characterizes the exchange about not using his inculpatory statements as a non-use agreement. *See id.*

Although the Tenth Circuit has not addressed a promise from an officer not to use a statement, other circuits have directly addressed this issue. The Third Circuit explained how law enforcement's non-use statements or agreements have an outsized impact on a suspect such that it may be the dispositive factor in the totality of circumstances analysis. *See Walton*, 10 F.3d at 1030. According to the Fifth Circuit, non-use promises are to be given immense weight in the analysis because of how attractive they are to defendants. *See Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987). Additionally, as discussed by the Third Circuit, a jovial environment and friendliness toward the suspect/defendant can be very deceptive, implicitly encouraging the person to speak more freely as if talking to a friend instead of an adversary. *See Walton*, 10 F.3d at 1030 (quoting *Miller,* 796 F.2d 598, 607 (3d Cir 1986)). And, similar to the facts in this case, the Western District of Pennsylvania held that a defendant's statements were involuntary when the agent's agreement to "speak off the record and his friendly manner combined to overcome [the defendant's] reticence about making statements to the FBI." *United States v. Conley*, 859 F. Supp. 830, 837 (W.D. Pa. 1994).

10

A key question in this analysis is what did the agents objectively agree to? The critical exchanges occurs at approximately 22 minutes into the meeting. Defendant says, "Let me ask you a question – anything I say y'all going to give me a case for? Can I get a case for any of this?" (Ex. 2 at 24:6–7.) Agent Barnett responded: "I'd have to read you your rights to hang *it* on you," *id.* at 24:9 (emphasis added), and Agent Marr agreed with Barnett by saying: "Ah, yeah." *id.* at 24:10. As the highlighted language in Agent Barnett's response suggests, resolution of this issue begins with determining what "it" refers to when Barnett said "I'd have to read you your rights to hang *it* on you." The government argues vehemently that "it" means a new case. (Doc. 32 at 25.) Indeed, Defendant did ask whether he could get "a case" out of the meeting, and the government says any agreement is limited to a new case, not a federal prosecution for the actions involved in the Parsons, Kansas, state case. *Id.* However, Defendant's question began with a reference to "anything I say," thus clearly conveying that he was concerned about his statements being used against him. The court finds that the more natural interpretation of Agent Barnett's statement, and the objectively reasonable interpretation, is that "it" refers to Defendant's statements such that Agent Barnett should be understood to have said "I'd have to read you your rights to hang [your statements] on you." Defendant clearly understood as much; later in the interview he told the agents, "I know this is off the record . . . .". (Ex. 2 at 46:12–13.) Thus, we have no doubt that *he* thought his statements were protected. Unsurprisingly, both agents testified that their understanding of the exchange was that unless they read Defendant his *Miranda* rights, they could not use Defendant's statements in a criminal proceeding against him. Finally, it is undisputed that no *Miranda* rights were ever read to Defendant during the meeting.

These facts establish a non-use agreement at approximately 22 minutes into the meeting. Furthermore, the court agrees with the Third Circuit that a law enforcement agent's non-use

11

assertion or agreement immensely distorts a Defendant's discernment about what he should or should not say.  Therefore, after considering the affable nature of the meeting, the agents' friendliness toward Defendant, and their non-use assertions, the court concludes that Defendant's statements following the non-use agreement exchange were involuntary.

Therefore, Defendant's motion to exclude his inculpatory statements from the beginning of the non-use agreement exchange (i.e., beginning at twenty-one minutes and thirty-five seconds in the recorded interview (Exhibit 1) or beginning with Defendant's second sentence in line two on page twenty-four of Government's Exhibit 2: "Let me ask you something.") is granted on the basis that they were involuntary.

**III.   Conclusion**

Defendant's motion to suppress Defendant's statements during the October 5, 2020 meeting (Doc. 22) is GRANTED IN PART and DENIED IN PART.  The jury trial is set for 9:00 a.m. on November 13, 2023, and a status conference will be held on October 30, 2023, at 9:00 a.m.  The court finds the interests of justice in allowing the parties to prepare for trial in light of the effects this ruling will have on the evidence that may be presented at trial justify a brief continuance of this matter until the aforesaid dates and outweigh the interests of the public and Defendant in a speedy trial.  Accordingly, the time from the filing of this order until the new trial date shall be excluded under the Speedy Trial Act.

IT IS SO ORDERED.  Dated this 26th day of October 2023.

                                                          __s/ John Broomes_____
                                                          JOHN W. BROOMES
                                                          UNITED STATES DISTRICT JUDGE